CEDAR RAPIDS GAS LIGHT COMPANY, Appellant, v. THE CITY OF CEDAR RAPIDS, IOWA, GEORGE S. LIGHTNER, Mayor of said city, C. H. CAMPBELL, W. H. STEPANEK, J. H. HUGHES, W. G. ROWLEY, E. W. WINTER, W. W. POST, W. C. BYERS, F. W. BARTA, D. FEIEREISEN, and J. K. STARMAN, Aldermen, and with the Mayor constituting the Council of said city, and H. S. KEFFER, Recorder.

**Municipal corporations:** REGULATION OF CHARGES FOR GAS: REASONABLENESS. A municipality may regulate the price to be paid for gas; and as its power in this regard is derived from the legislature a presumption exists in favor of its proper exercise, and it will only be declared otherwise by the courts, when it appears that the rate fixed by the city is so low that it amounts to a confiscation of property without due process.

**Same.** To determine whether an ordinance regulating the price of gas amounts to confiscation of property, it is necessary to ascertain the fair value of the plant at the date of the ordinance; the quantity of gas thus being furnished consumers; and the cost of production at that time.

**Same.** The reasonableness of rates charged for gas cannot be determined from the mere addition of the separate value of the component parts of the enterprise; nor from the cost alone, nor what it might cost to reproduce the plant; but consideration must be given to the original cost of construction, the amount expended in permanent improvements, the amount and value of stocks and bonds, the present as compared with the original cost of construction, the probable earning capacity under the rates prescribed, operating expenses, and possibly other kindred subjects.

**Same.** The value of the plant completed and earning a present income is the criterion for determining the reasonableness of rates to be charged for gas; but such income must be computed on the basis of reasonable charges.

**Same.** The good will of a corporation holding an exclusive fran-

chise cannot be considered in determining the reasonableness of rates to be charged for gas.

**Same.** The fact that a gas company is in the possession and use of land between its lots and the meander line of a river should be taken into consideration in determining the value of its property, although it cannot acquire ownership by adverse possession; as such possession is valuable since only the State can question its right thereto.

**Same.** The value of residence property of a gas company, in possession of tenants and not required for the immediate expansion of the business, should not be considered in determining the value of its property with a view to fixing reasonable rates for gas.

**Same.** Discarded property forming no part of the plant should not be considered in arriving at the value of the plant; and in determining the value of underground mains and pipes for supplying gas to consumers, their cost, the price at which they are usually sold, in connection with present prices and ordinary decay, should be considered.

**Same.** The entire cost of a high pressure pipe used in part to supply residents of the city with gas, but chiefly to convey gas to consumers beyond the city limits, should not be included in an estimate of the value of the company's property upon which to base rates to be charged.

**Same.** Where a gas company laid its mains and pipes in unpaved streets the fact that it would cost more to lay them after the streets were paved should not be considered in arriving at the value of the property.

**Same.** In estimating the value of a gas plant with a view to fixing rates to be charged for gas nothing should be allowed for the promotion and organization of the corporation.

**Same.** The owners of a gas plant in estimating the value of its property as a basis for gas' rates, are entitled to compensation for risks incurred in engaging in the business, for prudence and foresight in its development, but should not be relieved of the consequences of mistakes and errors in judgment.

**Corporations:** ADOPTION OF REGULATIONS: FIXING OF RATES BY ORDINANCE: MAXIMUM RATES. A corporation supplying gas to consumers may adopt rules and regulations for the transaction of its business, such as requiring security or payment in advance for gas, but in all cases such rules must be reasonable. And for that reason it cannot complain of an ordinance fixing the max-

imum rates for gas on the ground that it fixes a level price and eliminates a discount for prompt payment, and may therefore have the effect to create additional expense for collecting bills.

**Same:** COST OF PRODUCING GAS: ITEMS OF COST. In computing the cost of the production of gas to be furnished consumers, the gas used at the works in manufacturing the same should be figured at actual cost. And taxes on residence property owned by the corporation, in the possession of tenants and not required for immediate use in connection with the business, should not be included.

**Same.** It is the duty of a public service corporation to keep its plant continuously in repair and to provide means for that purpose; so that at the end of any given term of years the investment will remain the same and it will be in position to render its patrons unimpaired service; and in ascertaining the cost of producing gas for the purpose of regulating rates to be charged consumers, an allowance should be made for depreciation in the value of the plant.

**Same:** RATES: REASONABLENESS: LEGISLATIVE AND JUDICIAL POWER: EVIDENCE. The fixing of rates to be charged by a public service corporation for supplying gas to consumers is a legislative function, and when it has been found that the rates are not so low as to amount to a confiscation of property, the duty of the court ends; and the reasonableness of the rates to be charged is a question of fact to be determined from the circumstances of each case. In the instant case the rates governing the price to be charged for gas are not shown to be unreasonably low.

*Appeal from Linn District Court.*—HON. F. O. ELLISON, Judge.

TUESDAY, MAY 4, 1909.

REHEARING DENIED TUESDAY, NOVEMBER 16, 1909.

ACTION to enjoin the enforcement of an ordinance fixing the price of gas resulted in a dismissal of the petition. The plaintiff appeals.—*Modified* and *affirmed.*

*John N. Hughes* and *Grimm & Trewin, Frank C. Byers and Redmond & Stewart,* for appellant.

*J. W. Good, J. W. Jamison,* and *H. E. Spangler,* for appellees.

LADD, J.—On September 17, 1871, the city council of Cedar Rapids granted W. H. Whitta & Co. the exclusive privilege for a period of twenty years of laying pipes for the conveyance of gas in all streets and alleys within its corporate limits; and, in consideration thereof, gas was required to be furnished at $5 per one thousand cubic feet until the consumers numbered two hundred, when it should be reduced fifty cents, and, upon the increase of customers to four hundred, $1 per one thousand cubic feet should be deducted, and then to remain at $4 per one thousand cubic feet until the expiration of the grant, unless, owing to some discovery or improvement, the cost of production should be decreased, in which event a corresponding decrease should be made in the price. Early in 1872 the plaintiff company was incorporated with a nominal capital of $150,000 and stock issued at par value of $100 per share. This was divided equally among the members of the firm, W. H. Whitta, George F. Wright, and A. E. Swift. Nothing was paid for this stock save the assignment of the franchise obtained under the ordinance. In July of that year the purchase of ground upon which to place buildings was authorized, and also the issuance of bonds to the amount of $25,000, bearing interest at ten percent per annum, and on January 17, 1873, the ground having been bought, the purchase was approved, and a sale of the bonds at not less than eighty-five cents on the dollar directed. Out of the fund derived from this sale and other bond issues, in all not exceeding $75,000, and the income derived from the manufacture and sale of gas, the plant has been constructed at an expense, as plaintiff alleges, of $267,500. An annual dividend of one percent was declared in 1877 and the three years following, then a dividend of two percent in

1881 and 1882, one percent in 1883, four percent in 1884, four percent in 1896, and in 1897 six percent, the next year seven percent, and from that time on an annual dividend of eight percent has been declared. This was not accomplished, however, by the original promoters. In 1874 A. T. Averill and associates acquired one-half the stock for $16,000, out of which the sellers paid $15,000 of the bonds, and the Higley Bros. owned the other one-half. In 1877 Averill bought one-fourth of the stock of one of the Higleys, discharged the superintendent, and took personal charge of the plant "with the determination to either make it pay or blow it into the river," and to the efficiency of his management may be attributed in large measure, as the record before us clearly indicates, the results achieved; but the city afforded the opportunity for building up the enterprise, which during much of its growth has paid a substantial income on stock consisting at the outset of nothing but water. In May, 1896, the city council by ordinance extended the company's franchise for a period of a few days less than twenty years, with the condition that gas be furnished at $1.80 per one thousand cubic feet, with a discount of twenty cents to consumers for prompt payment and other discounts for large amounts and to the city. The company voluntarily had reduced the price to $1.15 per one thousand cubic feet with ten cents additional in event of failure to make prompt payment, and was selling as low as ninety cents per one thousand cubic feet to a consumer of large quantities by December 21, 1906, when the city council enacted the ordinance of which complaint is now made, in words following:

Section 1. Any person, firm or corporation supplying gas to the inhabitants of the city of Cedar Rapids shall charge not to exceed ninety cents (90c) per thousand cubic feet therefor, and no person, firm or corporation shall charge, exact or receive in excess of ninety cents

(90c) per thousand feet for gas supplied by them to any inhabitant of said city.

Sec. 2. Any person, firm or corporation, violating any of the provisions of this ordinance shall, upon conviction thereof, be punished by fine of not less than ten dollars ($10.00) or more than one hundred dollars ($100.00).

Sec. 3. This ordinance shall be effective from and after January 1, 1907.

Sec. 4. All ordinances or parts of ordinances in conflict herewith, are hereby repealed.

This action was instituted promptly, praying that the city be enjoined from enforcing the ordinance. A temporary writ of injunction was issued, but, on hearing, it was dissolved, and upon appeal a restraining order entered by this court on condition that all moneys exacted above the rate fixed be deposited with a designated trustee to bide the final decision.

I. The power of the municipality to regulate the rates to be charged for gas, save that these may not be so reduced as to deny to the company a fair return upon the property used in the service of the public, is not questioned. The sole inquiry is whether the ordinance, if enforced, will operate to deprive the company of fair compensation for the services to be rendered. The act of the municipality, in fixing rates, is purely legislative, and, as it is by virtue of authority given by the Legislature, is presumed to have been in the proper exercise of the power conferred. *Mayor and Aldermen of City of Knoxville v. Knoxville Water Co.*, 29 Sup. Ct. 148 (53 L. Ed. —). For this reason the rate established by the ordinance assailed is presumed to be reasonable, and this court, in inquiring whether this is true in fact, can only declare it otherwise upon finding that it is so low that its adoption will operate as a confiscation of plaintiff's property with-

1. MUNICIPAL CORPORATIONS: regulation of charges for gas: reasonableness.

out due process of law. *Cedar Rapids Water Company v. City of Cedar Rapids,* 118 Iowa, 234.

To enable us to ascertain whether such will be the effect of this ordinance it is apparent that three findings of fact are primarily essential as a basis for calculation:

2. SAME.

(1) What was the fair value of the company's plant at the date the ordinance was enacted? (2) How much gas was then being furnished consumers? (3) What was the cost per thousand cubic feet of gas, at that time, manufactured and distributed to consumers? With this data as a ' basis we shall be able to estimate the profits the plant will be likely to yield from sales of gas at the rate fixed in the ordinance, and, by comparison of these with the value of the property, determine as near as may be whether the return for the services rendered the public are so inadequate as to prove destructive of the company's investment.

II. The parties differ widely as to the value of the plant. These differences arise from estimates by witnesses, as well as from the inclusion or exclusion of various elements which are said to affect

3. SAME.

values. There is no controversy, however, if we understand counsel rightly, but that the company is entitled to have its property appraised at its fair value in December, 1906. What such an enterprise was then worth can not be determined by the mere addition of the separate values of its component parts, nor from the cost alone, nor from what it formerly might have been sold at if such price were influenced by excessive rates, nor from what it might cost to replace alone, for this, in view of its use, would involve mere estimates of depreciation and contingencies incident to construction; but as was said in *Smyth v. Ames,* 169 U. S. 466 (18 Sup. Ct. 418, 42 L. Ed. 819, 849): "The original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present, as

compared with the original, cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses are all matters for consideration and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be extracted from it for the use of a public highway than the services rendered by it .are reasonably worth." This was said with reference to fixing rates for common carriers, but evidently is applicable to cases of this character and was applied in determining the reasonableness of water rates in *Cedar Rapids Water Company v. City of Cedar Rapids,* 118 Iowa, 234, 260. Any person or corporation contemplating the purchase of such a property quite naturally would inquire into its history, the character of its management in the past, and the amount expended in its construction. The several items of dispute may be considered separately.

The witnesses for the company estimated that $25,000 would be required as working capital, aside from the supplies ordinarily carried, which included one thousand tons of coal and ten thousand gallons of oil, but were unable to sustain their opinion save by dealing in probabilities for its use, in the main speculative. It appears that collections for gas sold are made monthly, and, as these amount to about $8,000 per month, it is evident that, after the first month, enough would be on hand to meet current expenses. As supplies on hand were sufficient for immediate use, and for some months in the future, about all essential would be enough to take care of the pay roll for the first month, and $2,500 would be ample for that purpose and other possible contingencies. Even this much

appears to be more than the company in its experience has found it necessary to reserve. Also the sum of $100,000 was included by these witnesses as enhancement of value by reason of being a "going concern." As previously intimated, the value of the plant is to be estimated in its entirety, rather than by the addition of estimates on its component parts, though the latter course will materially aid in determining the value. Advantages have accrued through the sagacity of its management as contended by appellant. So, too, there are the inevitable mistakes which would not be likely in the construction of a new plant; but to put a new plant in profitable operation time would be required, and, aside from the intangible element of good will, the fact that the plant is in successful operation constitutes an element of value.

As said, the value of the system as completed, earning a present income, is the criterion. Insofar as influenced by income, however, the computation necessarily must be made on the basis of reasonable charges, 4. SAME.    for whatever is exacted for a public service in excess of this is to be regarded as unlawful.

Save as above indicated, the element of value designated a "going concern" is but another name for "good will," which is not to be taken into account in a case like this, where the company is granted a mono- 5. SAME.    poly. *Cedar Rapids Water Company v. City of Cedar Rapids,* 118 Iowa, 234; *Willcox v. Consolidated Gas Co.,* 29 Sup. Ct. 192 (53 L. Ed. —). The witnesses for plaintiff took into account "good will" in giving their opinion of the enhancement in value because of being a going concern, and we have no means of separating these so as to ascertain their estimate of the separate advantage of completion so as to earn a present income.

The buildings of the company are located on fractional block nine divided into five lots, and lots one and

two in fractional block ten.  All these lots front on First Street and border the Cedar River.  The government meander line seems to have been from thirty-three to fifty-seven feet from First Street, though the high-water mark was about one hundred feet nearer the river.  The company, by the construction of riprap work on made ground at the bottom of the stream, has added about fifty feet more.  Two of these lots cost the company $3,000 in 1902, and the others prior to that, as needed, $4,200.  Of course, the company has not. acquired title to the portion of the lots beyond the high-water mark, for, though long in occupancy, the statute of limitations does not run against the State.  *Park Commissioners v. Taylor,* 133 Iowa, 453; *Carr v. Moore,* 119 Iowa, 152; *Tomlin v. Railway,* 32 Iowa, 106.  But the company is in possession, and this was of value, especially as none save the State might challenge its right thereto. Without determining precisely where the high-water mark is, or reviewing the conflicting opinions of witnesses, we are inclined to think the evidence fairly shows this property worth between $15,000 and $20,000.

*6. Same.*

Across the street from the plant are lots one to five in block 9, known as the "Annex," and on which there are thirteen small houses, rented by the company.  The cost of these lots was $6,500 some eight years prior to the trial.  The plaintiff estimated that their value has increased to $16,500.  On the other hand, the city contends that they should not be considered at all in determining the value of the plant.  The evidence is all but conclusive that they will not be required for the immediate expansion of the work, even though the officers of the company may have had this in contemplation.  A witness for plaintiff testified that, with little more machinery, the present plant could be made to manufacture more than three times as much gas as now sold.  Another justified his conclusion that the annex should be in-

*7. Same.*

cluded by saying that the purchase was a wise precaution, and that, in view of the past growth of the city, these lots likely would soon be needed. The lots or others may be required some time, but no man can determine the contingencies of the future, and it will not, do to burden the patrons of today in order to provide for possible needs of those of five or ten years hence, at least when this is conceded not to be necessary in order to provide for equal facilities when demanded. This property should not be included.

The estimates concerning the value of the buildings varied from slightly more than $30,000 down to something less than $21,000. Witnesses called by plaintiff had enjoyed a larger experience, while those produced by the defendant entered into greater detail. A comparison of the evidence in connection with proof of the age of the buildings has led to the conclusion that $25,000 is not far from their true valuation. We are of opinion that plaintiff's real estate, excluding the annex, was fairly worth not to exceed $40,000 to $45,000, or $15,000 or $20,000 less than estimated by the witnesses of plaintiff.

But little controversy has arisen in estimating the value of other property, for, save certain items, the estimates of plaintiff's witnesses have been accepted by the city. Some purifiers were included which 8. SAME.    had been discarded. They were appraised at $1,600. These formed no part of the plant. If they were subsequently exchanged for something needed, this was long after the enactment of the ordinance.

In estimating the value of the cast-iron mains and pipes computation was made in behalf of the company at $32.50 per ton; a reduction being allowed from the price of December, 1906, of $5.50 per ton for depreciation. The record indicates that the price taken was the highest at which mains and pipes had ever sold, and that these ranged in previous years down as low as $18 per ton. The

pipes were not available for the market, and, in estimating
their value in the ground, the price of iron on the particu-
lar day the ordinance was enacted ought not to be seized
upon as the criterion of value, whether it were the high-
est or lowest price. No one in calculating on the value of
a similar plant would adopt such a rule. The cost of the
pipe, the prices at which it ordinarily had sold, in connec-
tion with present prices, should be considered in connec-
tion with depreciation by inevitable decay. An examina-
tion of the record has convinced us that outside figures
have been made by plaintiff's expert, and that his estimate
on the value of pipes and mains is several thousand dollars
too high.

The company extended its activities so as to furnish
gas to the people of Kenwood Park and Marion in 1905,
and to do this laid a high pressure pipe from the holder

9. SAME.    to these places. The cost of this pipe to the
city limits was $5,483, and was originally
charged to the Marion line. The evidence is to the effect
that the pressure from this pipe somewhat reinforces the
system, and that a few residents of the city are furnished
gas therefrom; but its principal use is to carry gas to the
consumers beyond the city limits, and no more than one-
fourth its value should be included in the appraisement.

The sum of $43,580 was added owing to the alleged
increase of value of pipes and mains because of being
underneath the pavement. The company had laid them

10. SAME.    before the paving was done, but it is argued
that, as the value of the mains and pipes are
to be estimated when in the ground, what it would now
cost because of the pavement to put them there should be
included in determining present value. If so, the con-
tingency of having to remove them at the expiration of
the franchise also should be taken into account. More-
over, the fact that most of the paved streets are paralleled
by unpaved alleys or parkings in which pipes might be

laid without removing the pavement, and possibly with less danger from electrolysis, is entitled to consideration. Nor is it to be forgotten that pavements yield to the ravages of time, and that with new pavements new pipe may be laid. Undoubtedly the values of the pipes are somewhat enhanced because of their location, but the entire immediate cost of opening and replacing the pavement is not the criterion for value which should be adopted. The contention illustrates how inequitable would be a rule arbitrarily fixing the value as that for which a system might be replaced. Aside from this being impractical it may safely be said that there is hardly an enterprise of this character, which, were it destroyed, would be restored as it was before. In ascertaining values in this way, the worth of a new plant of equal capacity, efficiency and durability, with proper discounts for defects in the old and depreciation for use, should be the measure of value rather than the cost of exact duplication.

Included in plaintiff's estimate of values are: Interest on capital during construction, $22,415; promotion and organization, $14,943.69; and engineering, $18,679.61. These are mere estimates of what might be expended for these purposes in the construction of a new plant. Of course, all the money required would not necessarily remain idle during construction, and the witness admitted that the only expense for promotion and organization he could think of would be attorney's fees in preparing proper papers. The expense for engineering was said to be the percentage taken into consideration by those contemplating such enterprises. Manifestly these estimates are largely speculative. Nothing can be allowed for the promotion and organization of the company, for it is immaterial by whom the plant may be owned in estimating its value.

Some other matters are discussed which do not require special attention. The plaintiff's chief expert esti-

mated the physical properties to be worth $365,564.41, and the petition alleged these to be $368,000. The defendant conceded the value of the plant to be $278,621.60. It had cost but $267,500. It had been assessed for taxation on the sworn statements of its president in 1903 at $99,020, in 1905 at $95,300 and in 1907 at $175,000, raised to $250,000 by the board of equalization, from which the company appealed as to any valuation above $108,000. In the five years prior to 1907, the company had charged off its books $65,500 for depreciation in value. And yet, notwithstanding the small value of the land, relatively, how marvelously has this property, consisting of machinery, pipes, mains, and the like, advanced in value notwithstanding the constant depreciation due to the combined forces of adolescence, obsolescence, inadequacy, and decay. An examination of the record has convinced us that the witnesses of the plaintiff have overlooked nothing which might tend to enhance their estimates of the value of the plant, and that in many instances their estimates are exaggerated.

Undoubtedly, risks have been incurred, and possibly mistakes have been made. Doubtless the purpose in fixing the high rates in the first ordinance was to compensate for these risks. Owners of such property, on the one hand, ought not to be excluded from the advantage of the prudence and foresight in its development, nor, on the other, should they be relieved of the consequences of mistakes and errors of judgment. At best, what a thing is worth is peculiarly a matter of opinion, and opinions of this kind ordinarily are as numerous as the witnesses who express them. A careful review of the entire record, which has been repeated, has led to the conclusion that a fair valuation of the entire plant is somewhere between $300,000 and $350,000. This is largely in excess of its cost, but, according to the record, the value of material as well as the cost of labor has

12. SAME.

greatly increased since much of the plant was constructed. On the other hand, to put the value above the limit mentioned would require us to ignore the depreciation due to age, decay, inadequacy, and the like, on account of which defendant has been charging off its books large sums, and which the proof shows should be taken into account.

III.    In 1905, the company sold seventy-six million seven hundred and eighty-two thousand six hundred cubic feet of gas, in 1906, ninety-one million one hundred and seventy-three thousand two hundred cubic feet, and in 1907, one hundred and three million seventy-nine thousand one hundred and ninety cubic feet. The evidence is to the effect that reduced prices increase the consumption, so that the last amount safely may be assumed as the minimum amount that will likely be sold hereafter. This, computed at ninety cents per thousand cubic feet, gives the gross annual income as $92,771.10. Undoubtedly some deductions should be made for bad debts, but according to the evidence an allowance of $.008 per thousand cubic feet will cover this item. The amount collected from each of the four thousand consumers of gas is relatively small. Under the former ordinance ten cents per thousand cubic feet was exacted 'in event of failure to pay by the 10th of the month.

The ordinance assailed fixes a level price, and appellant contends that the elimination of the discount for prompt payment will entail an expense of five cents per thousand cubic feet for collecting gas bills. 13. CORPORATIONS: adoption of regulations: fixing of rates by ordinance: maximum rate. This assumes that an equally efficient method of inducing payment may not be adopted by the company. That such corporations may adopt rules and regulations for the transaction of their business is well settled by authority. *Shephard v. Gaslight Company*, 6 Wis. 539 (70 Am. Dec. 479); *Tacoma Hotel Co. v. Tacoma Water Co.*, 3 Wash. St. 316 (28 Pac. 516, 14 L. R. A. 669, 28 Am. St. Rep.

35); *Harbison v. Knoxville Water Co.* (Tenn. Ch.), 53 S. W. 993; *Williams v. Mutual Gas Co.,* 52 Mich. 499 (18 N. W. 236, 50 Am. Rep. 266).

In each of these cases a rule requiring security or deposit of money in advance was approved. Of course, such rules must be reasonable and not impose an undue burden on the consumer. In *People v. Manhattan Gaslight Company,* 45 Barb. (N. Y.) 136, a rule that the company would refuse to furnish gas to one who had failed to pay his past-due bill was held to be reasonable, but in *Crumley v. Water Co.,* 99 Tenn. 420 (41 S. W. 1058) it seems to have been held that a water company may not refuse to furnish water on the ground that the applicant is indebted for a previous supply for which he is unable or refuses to pay. To the same effect, see *Gaslight Company v. Colliday,* 25 Md. 1. In *American Waterworks Company v. State ex rel. Walker,* 46 Neb. 194 (64 N. W. 711, 30 L. R. A. 447, 50 Am. St. Rep. 610), the rule required water rents to be paid on the first days of January and July of each year in advance at the company's office, and "if not paid within thirty days after they fall due the water will be turned off and not turned on until all back rents are paid, increasing the charge by $1 for turning water on and off." The court, while conceding the power of the company to make all reasonable regulations, held that that part of the rule exacting $1 as a condition precedent to turning on again unreasonable and void. See, also, *State v. Neb. Tel. Co.,* 17 Neb. 126 (22 N. W. 237, 52 Am. Rep. 404). In *Water Company v. Adams,* 84 Me. 472 (24 Atl. 840, 30 Am. St. Rep. 368) a rule that users of water liable for rent for the whole year, whether actually used for that length of time, but not requiring them to pay in advance, was held to be unreasonable. In *Shephard v. Gaslight Co., supra,* the court held that the company might not attach a penalty for the violation of its rules. *State v. Butte City Water Co.,* 18 Mont. 199

(44 Pac. 966, 32 L. R. A. 697, 56 Am. St. Rep. 574) decided that payment in advance might be exacted, but that the company could not refuse to furnish water to others than owners of property. In *Miller v. Wilkesbarre Gas Co.*, 206 Pa. 254 (55 Atl. 974), a rule that supply be stopped unless all arrearages be paid, whether owing by tenant in possession or his predecessor, was approved but held not to be binding in the absence of notice. In *Owensboro Gaslight Company v. Hildebrand* (Ky.) 42 S. W. 351, a rule requiring the deposit of $20 in advance was declared reasonable. To the same effect, see *Northern Colorado, etc., Co. v. Richards,* 22 Colo. 450 (45 Pac. 423). See, also, Thornton on Oils & Gas, section 541, where decisions are collected relating to the reasonableness of amounts required to be deposited in advance. The company may not base a rule on the theory that the people as a whole are dishonest, but it has the right to adopt a rule which, while giving the honest citizen what he pays for, will prevent the dishonest from getting that which he will never pay for. See *Harbison v. Knoxville Water Co., supra.* That the company may establish a rule exacting payment in advance in reasonable amounts, or the deposit of security, at least is fully settled by the authorities, and it would seem that the requirement of security or deposit of money in advance would be quite as effective in enforcing prompt payments and more so in avoiding bad debts than an increase in price upon failure to pay by a time stated, and it does not appear that collecting through such method or some other reasonable method that may be devised not obnoxious to the ordinance would entail greater expense on the company than under that of allowing discounts. At any rate, we can not assume in advance that consumers will not comply with such reasonable rules for the security of the company as may be embodied in their contracts, nor, in the absence

of satisfactory proof, that unusual expense will be incurred in collecting the price of the gas sold.

IV.   What does it cost to manufacture and distribute gas per thousand cubic feet to the consumer? The witnesses have estimated these separately, in the first including the expenses up to storing in the holder, and in the last all other items in delivering to and collecting the price from the consumer. They do not differ very materially on the cost of the several items, but are not entirely agreed as to what shall be included. Several persons of large experience testified on the subject but necessarily where the business of a company is well managed, and its accounts fairly kept, these furnish the best evidence of the cost of service rendered the public. The representatives of two accountant companies examined the books of plaintiff, the Audit Company of Illinois represented by George P. Kellogg for it, and the Marwick & Mitchell Company of Chicago represented by J. W. Hall for the city. They agreed that the books were fairly kept, and there was little difference between them in their deductions therefrom, save in the items making up the account. The one included $10,000 for depreciation in 1905 and $13,000 for 1906, while the other computed depreciation at $.05 per thousand cubic feet of the gas made, being $4,431.71 for 1905, and $5,330.82 for 1906. Their computations were made by including all the expenses for the year, including depreciation as above, and deducting therefrom the amount received for residuals, such as coke and tar, and dividing the difference by the number of thousand cubic feet of gas manufactured less leakage. The quotient, of course, would be the cost of manufacturing and delivering one thousand cubic feet of gas. In this way plaintiff's accountant found that the cost per thousand cubic feet in 1905 was $.756, and in 1906, $.799. According to the defendant's accountant the cost for 1905 was $.6745 per thousand cubic feet, and for 1906, $.6812. As

said, these different conclusions as to 1905 and 1906 resulted from some differences in the items included, to which attention is now directed.

The cost of mixed gas (that is, of coal and water gas) in the holder for 1905 was found by plaintiff's accountant to be $.394, and in 1906 $.415, per thousand cubic feet, while defendant's accountant made such cost $.3868 in 1905, and $.4111 in 1906. This slight difference is mainly due to the charge of plaintiff's accountant of $1 per thousand cubic feet for gas used at the works, while defendant's accountant allowed the actual cost. The latter was correct, for in ascertaining the cost of manufacture that used to accomplish this should be computed at the cost only. The defendant's accountant very properly excluded any allowance for taxes on the annex.

14. SAME: cost of producing gas: items of cost.

It appears that the company had charged off its books as depreciation in the value of its property due to use the following sums: $10,000 in 1902, $20,000 in 1903, $12,000 in 1904, $10,000 in 1905, $13,000 in 1906. In computing the expense of distribution, the plaintiff's accountant, as said, included these items, while the defendant's accountant allowed for depreciation of property $.05 per thousand cubic feet of gas manufactured. This would make a difference in manufacturing and distributing gas sold in 1905 of $.0714 per thousand cubic feet, and in 1906 of $.0816. There can be no doubt as to the justice of some allowance for depreciation. A public service corporation is under no obligation to sacrifice its property for the public good. Nor is it bound to see its property gradually wasted by wear and decay without making provision for its replacement. It is entitled to earn enough not only to meet the expenses of current repairs, but also to provide means for replacing the parts of the plant when these can no longer be used. "It is entitled to see that from its earnings the value of

15. SAME.

the property is kept unimpaired, so that at the end of any given term of years the original investment shall remain as it was at the beginning. It is not only the right of the company to make such provision, but it is its duty to its bond and stockholders and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued, the only method of providing for displacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stock. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both." This situation ought not to be brought about either by the payment of excessive dividends or the omission to exact proper prices for the output. *Mayor, etc., of Knoxville v. Knoxville Water Co.,* 29 Sup. Ct. 148 (53 L. Ed. —).

There is a wide divergence of opinion as to the amount that should be set aside for depreciation, but all the witnesses concede that their estimates are without data as a foundation, though the elements to be taken into account are enumerated. As contended, scarcely two parts of the plant will cease to be useful at the same time. Some will last but a brief period, while others may be serving their purposes for more than a century to come. Some stress is put on the possibility of enlargement and of the necessity of replacing parts with others adequate to meet increased demands, but there is no reason to think that the income will not keep pace with the extensions or enlargements. In other words, profits on the additional sales of gas will in all probability yield an adequate income on the amounts expended for the expansion of the plant. Should replacement of some of the machinery now in use prove necessary because of new inventions, this in all probability will be owing to the economy which may be effected there-

by in production, and again the saving may be expected to yield a fair return for the new investment. Moreover, the rate fixed by this ordinance is not necessarily perpetual, but subject to such changes by the governing board of the city as shall be essential to meet the contingencies of the future. The expert accountant who testified in behalf of defendant allowed five cents per thousand cubic feet of gas manufactured for depreciation, and another, who had made a study of the durability of different material, testified that if one and seven-tenths percent of the value of the plant were put into a sinking fund drawing annual interest at four percent per annum, this would produce enough to replace the plant in thirty years. The amount allowed by the accountant approximates this percentage of the value, and we are of opinion that in view of the evidence adduced it will prove adequate for replacement of the different portions of the plant when this shall become necessary. Appellee insists that the average cost during the past five years should be adopted. This, including depreciation, would be $.6404 per thousand feet. Another item is not to be overlooked, and that is the probability that in the future the company, in view of this investigation, will be required to pay its just portion of the burdens of taxation. What the increase shall be can not be told in advance, but it is likely to be enough to offset any decrease in the cost of fittings. The cost of gas production during the years 1905 and 1906 was much higher than for the years previous. This was not owing to the increased cost of fuel. The accountant of defendants testified that the cost of manufacturing and distribution, including allowance for depreciation, was $.57 per thousand cubic feet in 1902, $.5935 in 1903, $.6375 in 1904. This increase in cost was due in large part to the increase in the fittings account, such as installing stoves, meters, and the like. In 1902 there was a profit in this account of $283.99, in 1903, an expense of $972.80, in 1904 an expense of

$39.60, in 1905 of $6,758.89, and in 1906 of $5,943.83. This increase of expense of fittings, etc., over profits on the sale of stoves, etc., is not satisfactorily explained. There is no reason for thinking so large an outlay as in the last two years will be required in the future, and the probable increase therein may safely be allowed to offset probable increase in taxes. Upon an examination of the entire record, we are satisfied that the cost of manufacturing, distribution, and of making collections should not exceed $.6812 per thousand cubic feet at the time the ordinance was enacted.

V. The expense involved in the manufacture and sale of gas in 1907, including depreciation then, was $70,217.54. This deducted from the receipts leaves a net profit for the year of $22,553.56. This is $1,153.56 above eight percent on the cost as alleged by the company. It is $1,553.36 in excess of seven percent, if the plant be estimated at the valuation of $300,000, or a like sum above six percent if it is worth $350,000. If to these several margins be added the difference in the rates mentioned and that paid on the $75,000 of bonded indebtedness, the first of these will be increased by $2,250, the second by $1,500, and the third by $750. In other words, if the interest on the money borrowed be deducted from the profits, there will remain $18,803.56 net income realized on a net investment of $192,500 or on a net value of $225,000 to $275,000 or a return of seven or eight percent per annum on the value of the plant over the incumbrance. It may be that the margin is not large in view of the contingency of increased cost of collections and the risks incident to all enterprises of this kind, but we are not fixing the rates. That is purely a legislative function. The court's duty ends when it has found that the rates are not so low as clearly to be confiscatory in character. "Judicial interference should never occur unless

16. CORPORATIONS: rates: reasonableness: legislative and judicial power: evidence.

the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." *San Diego Land & Town Lot Co. v. National City,* 174 U. S. 739 (19 Sup. Ct. 804, 43 L. Ed. 1154).

What compensation will be reasonable is a question of fact to be determined in the light of the evidence in each particular case. No court of last resort has undertaken to say what percent on the value such an investment should yield its owners in all cases. In *Cedar Rapids Water Co. v. Cedar Rapids,* 118 Iowa, 234, 263, the court said: "The net earnings upon this showing, if not large, are substantial. The court can not undertake to guarantee the company any fixed or certain return upon its investment. The exercise of such a power would work an utter destruction of the legislative right to regulate rates of water companies and other corporations operating works of public utility. We think the decisions have already gone to the verge of safety in nullifying legislative acts of this character; and to go farther, and say that the courts will not only preserve property from confiscation and destruction by legislative power, but will also assure to its owners a definite and fixed rate of profit upon their investment, would be an act of judicial usurpation." In that case the value of the plant was estimated from $400,000 to $500,-000, and rates yielding an income of five and one-half percent on the former sum or four and one-half percent on the latter were held not to be confiscatory; the court re-marking that the "estimate of earnings may be very materially reduced, or the estimate of the value of the plant be very materially increased before the court will be justified in saying that plaintiff's property is being exposed to destruction or confiscation by an unprofitable schedule of rates." In *Mayor, etc., of City of Knoxville v. Knoxville*

*Water Co.,* 29 Sup. Ct. 148 (53 L. Ed. —) the court, after reviewing former opinions, concluded that: "Under any aspect of the evidence the company is certain to obtain a substantial net revenue under the operation of the ordinance. The net income, in any event, would be substantially six percent, or four percent after an allowance of two percent for depreciation. See *Stanislaus County v. San Joaquin, etc., Irrigation Co.,* 192 U. S. 201 (24 Sup. Ct. 241, 48 L. Ed. 406). We can not know clearly that the revenue would not much exceed that return. We do not feel called upon to determine whether a demonstrated reduction of income to that point would or would not amount to confiscation. Where the case rests, as it does here, not upon observation of the actual operation under the ordinance, but upon speculation as to its effect, based upon the operations of a prior fiscal year, we will not guess whether the substantial return certain to be earned would lack something of the return which would save the effect of the ordinance from confiscation. It is enough that the whole case leaves us in grave doubt." In *Stanislaus County v. Irrigation Co.,* cited, it was remarked concerning an irrigation canal that: "Much of the capital was invested between 20 and 30 years ago, and to be able still to realize six percent upon the money originally invested is more than most people are able to accomplish in an ordinary investment and more than is necessary in order to give just compensation for property at the time it is used for the public purpose originally intended." In *Willcox v. Consolidated Gas Company,* 29 Sup. Ct. 192 (53 L. Ed. —) the court, after observing that "there is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested," concurred in the finding of the trial court that, in view of the facts proven, "complainant is entitled to six percent on the fair value of its property devoted to public use."

When government bonds bearing two percent annual interest are selling at a premium, and those issued by state or municipalities at little if any more than double such rate are in demand, and when the current rate of interest on "gilt edge" securities on real estate or public service corporations rarely exceeds five percent, it will not do for the courts to say that the income, above all expenses, including taxes, on property devoted to the public service, must necessarily much exceed the last-mentioned rate to avoid the charge of being confiscatory. What such plants usually earn, unless they be based on reasonable charges, can not be accepted as a criterion, for usually the rates fixed are all the tariff will bear. Possibly the plant should earn a return equal to the interest paid in the community on investments equally permanent in character, but what this was is not disclosed by the record. The rates fixed by the ordinance are likely to yield enough above six percent per annum on the present value of the plant to cover contingencies which may not have been taken into account, and, in view of the fact that effect of the ordinance is largely speculative, we are not inclined to interfere with its operation. If upon a fair trial it shall appear that under the new schedule the rates are not sufficiently remunerative, a remedy may be applied. The function of fixing compensation for public services should be exercised with a keen sense of justice on the part of the regulating body. The company should aid therein by a frank and full disclosure of its affairs. When so approached on either side, it would seem that rates might be settled upon which, on the one hand, would not dampen the zeal to furnish the best service and extend the plant as the needs of an advancing municipality shall require, nor, on the other hand, extract from the people more than fair compensation for the service received. Should the ordinance, after being put in operation and given a fair test, be found to deprive plaintiff of a fair return on its invest-

ment, it ought not to be deprived of the opportunity of again presenting the matter in court.

For this reason the petition will be dismissed, without prejudice to such action.

As so modified, the judgment is *affirmed*.