J. W. EDGERLY & Co., Appellants, v. CITY OF OTTUMWA et al., Appellees.

HARPER & McINTIRE Co., Appellant, v. CITY OF OTTUMWA et al., Appellees.

**MUNICIPAL CORPORATIONS: Municipal Water Plant—Private**
1  **Sprinkler Systems—Right to Fix Rates.** Though the installation by a private property owner of an automatic fire sprinkler system connected with a municipally owned water plant may be of great benefit to the city and to the public in general, yet the one installing the system likewise acquires a distinct personal advantage, and imposes on the municipal water plant a peculiar service, personal to himself *for which he may be compelled to pay.*

**MUNICIPAL CORPORATIONS:** Municipal Water Plants—Rates—
2 **Reasonableness.** The *reasonableness* of the water rates fixed by the trustees of a municipally owned water plant is not a material question, so long as such rates, with other authorized income, accomplish only that which the statute authorizes or requires. (Sec. 749, Code, 1897.)

**MUNICIPAL CORPORATIONS:** Municipal Water Plant—Rates—
3 **Discrimination and Extortion.** While the water rates of a municipally owned water plant must not necessarily be reasonable when compared with the rates of a privately owned plant, yet they must not be unduly discriminatory or extortionate as compared with the rates exacted of consumers generally. (Sec. 749, Code, 1897.)

**MUNICIPAL CORPORATIONS:** Municipal Water Plant—Duty to
4 **Furnish Water—Sprinkler System.** Whether an enforceable duty exists on the part of a city owning its own waterworks plant to furnish water to a privately owned automatic fire sprinkler system, *quaere*. (The discussion on this point leaves no doubt that the court purposely refrained from saying anything implying the existence of such duty on the part of the city under *all* and *every* circumstance, but did intend to be understood as saying that, generally speaking, such duty exists.)

**MUNICIPAL CORPORATIONS:** Municipal Water Plant—Duty of
5 **City to Furnish Water—Sprinkler Systems—Uniform Rates.** A city which owns its own waterworks plant, and has undertaken to supply private automatic fire sprinkler systems with water, must carry out its implied contract to continue such service, and cannot treat the matter of compensation as a mere matter of contract. *It must fix uniform rates.*

**MUNICIPAL CORPORATIONS:** Municipal Water Plant—Failure to
6 **Furnish Water—Liability Obviated by Contract.** Whether a city owning its own water plant would be liable for the consequences of its failure to furnish water for a privately owned fire sprinkler system, *quaere*; but it is suggested that such liability might be obviated by contract.

**MUNICIPAL CORPORATIONS:** Municipal Water Plant—Sprinkler
7 **Systems—Rates—Discrimination and Extortion.** Evidence reviewed and discussed as to the elements appropriate for consideration in the fixing of uniform water rates for automatic fire sprinkler systems, and *held*, the rates in question were neither discriminatory nor extortionate.

*Appeal from Wapello District Court.*—C. W. VERMILION,
Judge.

THURSDAY, FEBRUARY 17, 1916.

THE two cases are submitted on the same record. Each
plaintiff had installed an automatic fire sprinkler system in
its building, connected with the water supply of the city. The
city demanded for this service $100 per annum from J. W.
Edgerly & Co., and $108.28 from the Harper & McIntire Co.,
refused $24 per annum tendered by each, and threatened to
shut off the service unless the amount demanded were paid.
Thereupon, these suits were begun, enjoining the city from
so doing. On hearing, the petitions were dismissed. The
plaintiff in each case appeals.—*Affirmed.*

*McNett & McNett* and *Chester W. Whitmore,* for appellants.

*Lloyd L. Duke* and *Gilmore & Moon,* for appellees.

LADD, J.—I. The city of Ottumwa owns and, through
trustees, operates the waterworks of that city. The Harper &
McIntire Co. owns a building fronting on Commercial Street
93 feet, extending back 128½ feet, and 5 stories high, with
a basement, and conducts therein its business as a wholesale
hardware dealer. This building was completed early in 1913,
on the site of another which had been destroyed by fire in
August previous, with which fire, as is claimed, the facilities
afforded by the city were inadequate to cope. This may
account for the installation in the new building of the auto-
matic sprinkler system. It consists of supply pipes or "lead-
ers" hanging below the ceiling on each story, about 8 feet
apart. On each pipe, also about 8 feet apart, are attached
sprinkler heads. The air pressure in the supply pipes in the
building feeding the sprinkler heads holds the water back
until released by opening the sprinkler head by fire. An elec-
tric pump with which to force in the air holding back the

water from the pipes is required. This is what is known as the "dry system," and is used where the pipes are exposed to frost. The system is connected with the city water supply by a 6-inch pipe in the basement, installed at the company's expense; and from this, three 4-inch pipes extend to the top of the building, from which the leader pipes are supplied with water. A cut-off valve is located in the street, by which the water may be shut off. An automatic fire alarm system was put in, by which the movement of water in the leaders is instantly made known to the fire department, as well as in different parts of the building and on the outside. The sprinkler heads are set on the pipes with their small ends up; and when the solder therein is melted by heat, the water flows through the opening, striking a part causing a spray and flowing about 30 gallons of water a minute. To meet a possible emergency, should the city pressure or supply fail, a second source of supply was provided by the company. It constructed a tank 20 feet above the roof, with capacity of 20,000 gallons of water. The water therein is supplied by a 2-inch riser pipe from the 6-inch connection pipe. It is a gravity tank, and the water is released therefrom into the sprinkler system when the pressure of the city mains, which is 85 or 90 pounds, falls below that of the tank, or 39 pounds in the basement. The company was at an expense of $5,393 for the installation of the system.

J. W. Edgerly & Co. constructed a four-story building on West Main Street, and conducted therein a wholesale drug business. An automatic sprinkler system was installed by it with a tank of capacity of 17,000 gallons, at an expense of $5,000. It is the wet system, as the pipes were not exposed to freezing temperature and air pressure was not necessary. It differs from that installed by the Harper & McIntire Co., in that the 6-inch pipe connecting the sprinkler system with the city water main runs back under the basement floor at a distance of 30 or 40 feet from the front of the building. There, the 6-inch pipe branches into two 6-inch pipes, one 6-inch pipe

running to the tank on the roof, and the other 6-inch pipe, running to a point near the ceiling of the basement, branches into two 5-inch pipes running in different directions: one toward the front of the building, and the other toward the rear. Each of these 5-inch supply pipes extends in that size to the top of the top story of the building. The sprinkler heads are served by branches which grow gradually smaller in diameter as the distance from these main 5-inch supply pipes increases. Reverting to the 6-inch pipe which runs to the tank, the pressure from the water main is not applied throughout the full length of this pipe to the tank. The pressure is held back by a check valve in the basement. The tank is filled through the 6-inch pipe by means of a 2-inch by-pass pipe; that is, a 2-inch pipe about 3 feet long, leaving the 6-inch pipe in front of the check valve, and returning into the 6-inch pipe back of the check valve. Water is let into the tank through the 6-inch pipe by means of the by-pass pipe. The water that enters the tank is the quantity that would flow through a 2-inch pipe, because the water for the tank flows through the 2-inch by-pass pipe around the check valve. Ordinarily, the valve is closed and water does not flow into the roof tank until it is turned on by some human agency.

II. We have described these systems somewhat particularly, that the contentions of the respective parties may be better understood. The controversy is whether the rates of compensation for service rendered by the waterworks owned by the city are unreasonable and discriminatory. The evidence disclosed that these or similar systems are in quite general use in the different cities of the country of the size of Ottumwa, and larger; that fires starting in buildings equipped therewith are extinguished by the opening of a small percentage of the sprinkler heads; that the fire loss is greatly decreased thereby, and this with a large saving of water. Besides, the danger of

1. MUNICIPAL CORPORATIONS: municipal water plant: private sprinkler systems: right to fix rates.

fire is reduced for a distance of 80 feet on each side. For these
reasons, no charge is made in many cities for the service ren-
dered such systems in supplying water and necessary pres-
sure. But those who install these systems derive an advantage
therefrom, not only in the large reduction in insurance
charges, but in the assurance afforded against interruption in
business by fires; so that, notwithstanding the expense of
inspection and maintenance, direct benefits may be such as to
render the investment desirable. Though these systems may
increase the efficiency of the fire departmnt and afford pro-
tection against fire, which otherwise would be exacted of the
municipality, some burden is cast thereby on waterworks. This
was pointed out by Jaggard, J., in *Gordon v. Doran,* 100 Minn.
343 (111 N. W. 272), saying:

"So long as water supplied for protection against fire
is a purely public service, under the control and management
of municipal authorities generally and under the fire depart-
ment specifically, no direct charge to individuals is proper.
When, however, a sprinkling connection is made with private
premises, the situation is materially different. These premises
and the primary causes of catastrophe to the building and of
the consequent possible use of disastrous quantities of water
are primarily under the control, not of the public, but of the
owner. A peculiar personal service is provided for his benefit,
which is not enjoyed in common by the community in general,
but is available only to a limited class of individuals. It
does not advance the reasoning in this connection to split
hairs between the 'use' and the 'consumption' of water. As a
matter of good sense the property owner beneficially employs
the water mains for his own purposes and to his own advan-
tage, although he may not, except in case of fire, acutally draw
any water from the pipes. It is necessary and proper that
for this he should pay. In effect he gets something of pecuniary
value from another, which that other is not compelled to give
except on the basis of contract. That the law requires the
terms of that contract to be reasonable and impartial, or that

advantage is mutual and involves no expense is merely incidental or collateral. Such facts do not relate to the right to exact some consideration, however they may affect the extent of the charge which may properly be made."

The same view was entertained in *Cox v. Abbeville Furniture Factory*, (S. C.) 54 S. E. 830; *Niehaus Bros. Co. v. Contra Costa Water Co.*, 159 Cal. 305 (36 L. R. A. [N. S.] 1045); *Shaw Stocking Co. v. City of Lowell*, (Mass.) 85 N. E. 90.

III. Appellants do not question the right to exact some compensation, but insist that the rates fixed by the board of trustees of the waterworks are excessive. These rates are: For 300 sprinkler heads or less, $50 per year; 300 to 700 heads, $75 per year; 700 to 1,100 heads, $100 per year; and 9 cents per head for all over 1,100 heads. The result is that J. W. Edgerly & Co. was required to pay for 800 sprinkler heads on its system, $100, and Harper & McIntire Co., for the 1,192 heads, $108.28. One of appellants' contentions is that these rates are unreasonable. Were the waterworks owned by an individual or private corporation, we should not hesitate in saying that no more than reasonable compensation for the service rendered might be exacted. *Cedar Rapids Water Company v. City of Cedar Rapids*, 118 Iowa 234; *Cedar Rapids Gas Light Co. v. City of Cedar Rapids*, 144 Iowa 426. But, as held in *Sloan v. City of Cedar Rapids*, 161 Iowa 307, the authority of the city is broader than that of an individual or private corporation, and it may exact rates to cover the purposes specified by statute, even though these may be somewhat ·in excess of the reasonable compensation which might be exacted by private owners. Chapter 5 of Title V, as amended, provides for the acquirement of waterworks by cities and their management by trustees, and Section 749 of the Code specifies what water rents or rates shall be:

"The said board of waterworks trustees shall from time to time fix the water rentals or rates to be charged for the

2. MUNICIPAL CORPORATIONS: municipal water plants: rates: reasonableness.

furnishing of water, and such rates shall be sufficient, together with the proceeds of the five-mill water levy and the sinking fund levy of two mills, for the maintenance and operation of such works, the proper and necessary extension thereof, for all repairs, and for the payment of the purchase money or cost, principal and interest, incurred in the purchase or erection of such works, as the same falls due, according to the tenor of the mortgage and bonds given to secure the payment of such purchase price or cost.''

This section not merely confers on the board of trustees full authority to fix water rents or rates, but, while exacting that these shall be sufficient with the tax levy to meet specified purposes, impliedly prohibits fixing them in excess of what may be essential to meet such demands. This inference is confirmed by the fact that there is no provision for other disposition of the income from the plant in excess of these needs. Plainly enough, the enjoyment of the utility by the public at the actual cost of the service rendered, and without profit to the city, is contemplated in authorizing the acquirement of waterworks at the expense of the taxpayers. As the latter, through the municipality, own the plant, and it can acquire it in no manner other than as pointed out in the chapter mentioned, the inquiry as to whether the rates exacted by said trustees are reasonable or not, unless constituting in some way an abuse of the taxing power, is not pertinent to any proper issue, for the trustees are required to make them high enough to be sufficient for the purposes specified.

IV. But they may not unduly discriminate between patrons, exacting different prices for like or similar services, nor arbitrarily differentiate between different services, by charging rates for one out of all proportion as compared with another service. This is elementary; for it no more than exacts that those in charge of the utility established for the public weal, accord to patrons generally service on equal terms. *Gordon v. Doran,* 100 Minn. 343 (111

**3. MUNICIPAL CORPORATIONS: municipal water plant: rates: discrimination and extortion.**

N. W. 272, 275). There is no claim of any discrimination as between plaintiffs and the five others making use of the same or like systems. Even if there were, and the rates charged were out of proportion to those exacted for other service, however, appellees contend, as we interpret brief, that the service required by sprinkler systems is so peculiar that it is optional whether it be rendered, and, if rendered, the compensation therefor is mere matter of private treaty. The city may own the plant or it may grant to an individual or corporation authority to erect and maintain the waterworks (Section 722, Code), in which event it may require such person or corporation, "to furnish any person applying therefor, along the line of its pipes, mains . . . water . . . and to supply said city or town with water for fire protection and . . . water . . . for other necessary public purposes, and . . . to regulate and fix the charges for water meters . . . or other device or means necessary for determining the consumption of water." Section 725, Code Supp., 1913.

4. MUNICIPAL CORPORATIONS: municipal water plant: duty to furnish water: sprinkler system.

Having prescribed what the city may exact of a private owner, it is only fair to presume that it has equipped its plant to do what it may require of another. As an individual or corporation must have furnished water to anyone applying along the pipes or mains, why should not the municipally owned plant? But as the appellees are furnishing the service required, we are not concerned in ascertaining whether the service is such as the city may be compelled to render. Cities are empowered to do many things which they are not compelled to perform. The defendants have undertaken to supply water and pressure for these systems, and, having so undertaken, it is clearly their duty to carry out the implied contract of continuing the service. Moreover, the trustees, as seen, have fixed the rates for

5. MUNICIPAL CORPORATIONS: municipal water plant: duty of city to furnish water: sprinkler systems: uniform rates.

serving sprinkler systems, but, to sustain these, they contend that, as it was merely matter of private contract, they cannot be questioned. For what purpose water shall be used by the consumer is not defined. It is furnished for public, as well as for private, use, and generally, in fixing rates, the relative expense of these is first ascertained. It is also to be observed that how water supplied for fire protection shall be handled is nowhere prescribed. Ordinarily this is by applying it directly against the flames by means of apparatus owned by the municipality; but, however done, it is for the purpose of preserving private property from destruction. Though primarily for the benefit of the individual owner, the sprinkler systems incidentally serve a public purpose. Is it any less a public purpose to extinguish fire by forcing water through leaders or pipes and sprinkler heads than as done by the fire department? The difference is merely in method—in one, water passing through privately owned pipes, and in the other, through the hose of the fire department—and in the scope: one limited to one building, and the other extending over the entire city. The evidence shows conclusively that the sprinkler system not only extinguishes fires breaking out in the building in which installed, thereby obviating any action by the fire department and the spread of fire to near-by buildings, but decreases the danger of fire to these and preserves the building as an obstacle to the spread of the flames. The circumstance that the majority of plants owned by cities and many others, estimated at one third, make no charge for water connections with the sprinkler systems, because thought to be advantageous to the fire departments in shielding against destruction by fire, is a strong indication that the service rendered is beneficial to the public, as well as to the individual owner. They have become a recognized appliance for fire protection and conservation of business interests and, though installed at private expense and in part under private control, do render a valuable service to the public in guarding against

the ravages of fire, both in the buildings where placed and others near by.

Appellees argue, however, that, if owners of property are entitled to such service, then, on failure of the water supply or pressure, the owner of the works would be liable for the consequences of such failure. Even if this

6. MUNICIPAL CORPORATIONS: municipal water plant: failure to furnish water: liability obviated by contract.

were true, a point not necessary to decide, furnishing water is made by statute subject to reasonable regulation, and liability of this kind might be obviated thereby, or through contract with the patron. *Buchanan & Smock Lumber Co. v. East Jersey Coast Water Co.*, (N. J.) 59 Atl. 31; *Jones House Furnishing Co. v. Arkansas Water Co.*, (Ark.) 52 L. R. A. (N. S.) 402. As these or similar systems are in common use in the cities throughout the country, are of great value to those installing them, beneficial to the public, simple and similar of construction, readily regulated and easily inspected, and susceptible of being connected so as to avoid, partially at least, endangering the efficiency of the fire department, and supplying in much the same manner as to other consumers of water, even though not using as much as many, we perceive no tenable ground for subjecting owners thereof to the uncertainties of private negotiations with the trustees while fixing uniform rates for others, and are of the opinion that, under the statute, the matter of compensation is to be adjusted by the trustees by fixing the uniform rates to be exacted for the service such as may be rendered sprinkler systems.

IV. It is argued that the rates were discriminatory and extortionate as compared with water furnished to applicants generally. The evidence disclosed that after the pipes and tanks were once filled, only about 1,000 gal-

7. MUNICIPAL CORPORATIONS: municipal water plant: sprinkler systems: rates: discrimination.

lons per annum were lost from each by evaporation, and the water used in extinguishing fires would ordinarily be but a few thousand gallons more. The rate to ordinary con-

sumers was fixed at 30 cents per 1,000 gallons up to 10,000 gallons, 25 cents from 10,000 to 30,000 gallons, 20 cents up to 50,000 gallons, 15 cents from 50,000 to 175,000 gallons, 12½ cents from 175,000 up to 300,000 gallons, and 10 cents from 300,000 to 500,000 gallons. It is evident that payment for the small quantity of water used would be wholly inadequate as compensation for the pressure required and the readiness at all times to serve and the inspection by the city, which might well be exacted. Moreover, meters had not been installed, and were objectionable to the insurers because of impeding the flow of water. Service rendered cannot be compared with that to customers generally; for that for which compensation is exacted is not required by them. The same may be said of the rates exacted from hydrants. The evidence disclosed that these were distributed as follows: One in the Grand Opera House; one in the Garrick Theater; four in buildings of each of two railroad companies; two in street car barns, for which $15 each was charged; seven in the United States post-office building, all for $50; seven hydrants outside on the premises of the Dain Manufacturing Co., at $25 each. Most of these had two 2½-inch openings, supplying a hose with a 1¼ nozzle with 80 to 85 pounds pressure. These hydrants have but one or two openings. None extend above the basement. The four furnished each of the railway companies are connected with a 4-inch pipe, and the one in the opera house had a 4-inch connection extending into the basement. Most of them had 2½-inch openings, supplying a 4-inch hose with a 2½-inch opening and a 1¼ nozzle and 80 to 85 pounds pressure. Those in the government building had 1½-inch openings. The seven hydrants on the Dain Manufacturing Company's premises are connected with an 8-inch main. The expense of installing all these hydrants was borne by the respective owners. Whether anything at all should be exacted for hydrants is a matter of controversy. It is one of the functions of the city to furnish adequate fire protection, and whether resort is

had to the privately installed hydrants, in event of fire, or to those of the city, for water to extinguish it, cannot well affect the expense in pumping and the like. The Wisconsin Railway Commission, in *In re Appl. Oconto City Water Supply Co.*, at page 566 of Vol. 7 of its reports, says:

"If protection given by the city to a private concern, in the form of protection through fire hydrants, is not adequate, the concern in question will be unable to secure water enough to meet its fire demand. In such a case the total apparent fire demand upon the water plant will fall short of the total as it would be with adequate protection by the amount by which the private concern is unable to exercise its full demand, and the cost to the utility of furnishing such inadequate protection will be less than the cost of supplying adequate protection. Therefore, in case the city fails to furnish adequate protection, the installation of a private hydrant system, enabling the concern to secure adequate protection, will increase the costs to the utility up to the point where sufficient protection is furnished to meet the fire demand of the concern in question. The cost to the utility will, however, be the same whether such adequate protection is furnished by the city or by a system of private hydrants. In view of the fact that it is a recognized function of a city to furnish reasonably adequate fire protection, it seems clear that, as far as the water utility is concerned, the city should be the only party to pay for hydrant fire protection. The mere fact that a city fails to fulfill its duty of supplying adequate fire protection to buildings and structures within its limits, does not justify the water utility in making a charge against a private concern because that concern has installed hydrants which enable it to secure adequate protection."

It was concluded that the fire demand of the city should be treated as a unit; that the utility should charge the city for necessary hydrant protection; and that the charge should be adjusted between the city and the owner on whose premises

the hydrant has been installed. Like rulings have been made by the commission in several cases. In the same case, the commission observed, with reference to an automatic sprinkler:

"With regard to inside fire protection, such as automatic sprinkler systems, the charge directly to the property protected may be justified. It is not ordinarily regarded as being the duty of a city to furnish inside fire protection, but, aside from any theories as to the city's obligations, the charge for such protection appears to be in accord with the cost of service principle. The demand which may be made by an automatic sprinkler system is entirely apart from either the domestic demand or that of the hydrant system. From the very nature of the service it is likely to occur at the same time as the ordinary fire demand. When an automatic sprinkler system is in use, the waterworks must have a capacity equal to the combined domestic and hydrant demands, with sufficient leeway to take care of sprinkler systems. This is especially true in case of fire destroying a building equipped with sprinklers, where the pipe supplying sprinklers is likely to be broken, yet the waterworks-must be capable of supplying its other service, even with the waste through broken connections. It is true that the installation of a single sprinkler system might not affect the required capacity of the plant and the investment, but any general introduction of such systems would certainly require an increased station capacity. Investment and operating expenses are directly affected by such sprinkler systems, which indicates that inside fire protection is a class of service which should be charged for independently of other classes, and charged directly to parties served."

In *In re Invest. Ashland Water Co.*, 14 Wis. Railway Commission Reports, 70, the commission remarked, on the same subject:

"It is usually more quickly gotten into service when a fire starts and is universally considered as being more efficient than the use of ordinary fire hydrants by the fire department.

Its presence frequently obviates the use of the outside hydrants and any work on the part of the firemen. It being usually more efficient in fire fighting, its installation produces a saving to the property owner through a reduction of insurance rates. It is of value to all concerned, but particularly to the property owner served. That it is of value to others may, under some circumstances, warrant the elimination of charges for such service, but the necessary circumstances do not exist here."

There, the basis of estimating the compensation to be exacted was the floor area, but it was thought that the sizes and relative capacities of the connections with the mains furnished the most logical basis for fixing the charges. To this, cost of inspection and supervision should be added, according to this authority, as well as of the water supplied, the expense of installing the meter to be borne by the owner. The rate was fixed at $100 per annum for unmetered 6-inch connections, and for metered 6-inch connections, $20 and commercial price for amount of water used. In *In re Application City of Manitowoc*, 15 Wis. R. Com. Reports, 212, the rate for private hydrants was fixed at $30 each, and for sprinkler system, $20, and 5 cents for each sprinkler head above 400. About the only comparison to be made of a private hydrant with the sprinkler system is that both are for fire protection, and each exacts a readiness to serve. But the hydrant, besides having smaller connection, is without pipes for distribution of water over a large area, and the like danger of breakage. A hydraulic elevator service with a 4-inch connection appears to have been installed in one 4-story building, but the rate therefor was not shown. We are not saying that charges exacted for different kinds of service are not appropriate to be considered in making that of any one. What we do say is that no other service is so like the service rendered the sprinkler system that the one may be referred to as a criterion for fixing the charges to be exacted for the other. In establishing rates for such service, the size of the connection

is generally regarded as an important matter to be taken into account; and, if this only were to be considered, it is evident that the Dain Manufacturing Co. and the railway companies, and not plaintiffs, are being overcharged. But that cannot be regarded as the only basis for fixing rates for this and similar service. As observed by the Wisconsin Railway Commission, this would seem to be an added demand on the capacity of the water supply to the extent of the water which might flow through the connecting pipe. Only on rare occasions, however, would such a demand be likely; for to make it all, the sprinkler heads would have to be open, or in some manner the connecting of all supply pipes be broken, nor would breakage in several systems be likely at the same time. Much of this risk, it would seem, might be obviated by the installation of a valve in the connecting pipe remote enough so that, in event of such an emergency, the water could be cut off. The danger from breakage of pipes, also, should be taken into account. There is extensive exposure of pipes throughout the building, and the danger of breakage is always present, and especially in event of the falling or crumbling of the building from burning or other calamity. It would seem that serious consequences to the pressure elsewhere might be obviated by the installation of a valve sufficiently remote from the building so that, in event of breakage, the water supply might be cut off. Such a system is essentially a part of a larger system for fire protection supplied by the waterworks, and may well be the subject of adequate inspection by the fire department of the city, and necessary expenses therefor should be considered.

Though little water may be used, the city is required to be in readiness to serve at all times and maintain an adequate pressure, in order to render the system of any value. To be in a situation to do so, it must provide for interest on $275,000 of bonds, the cost of maintenance, necessary repairs and improvements, and provide a sinking fund to discharge its indebtedness. There is no more reason for exempting

owners of these sprinkler systems from meeting their proper share thereof than any other patrons of the city waterworks. Readiness to serve is agreed to be a proper element to be considered by all who are of opinion that any charge may be exacted. *Gordon v. Doran,* 100 Minn. 343 (8 L. R. A. [N. S] 1049).

Of course the amount of water used should be taken into account, as well as any saving to the city by reason thereof in supplying water in event of fire through the sprinkler heads, instead of the fireman's hose. As no meter was used, this was matter of estimation; but we are not inclined to the view that any benefit to the owner of the property in which the sprinkler system is installed may be considered. The benefits conferred by supplying water for domestic uses vary greatly, as do those enjoyed by business houses and factories. Scarcely two are alike in the advantages afforded by the utility, and yet no discrimination in rates is made on that account. In *Ladd v. City of Boston,* (Mass.) 40 L. R. A. 171, the point was not involved, the only issue decided being that fixing the rate according to the number of fixtures used was not unreasonable, even though complainant paid more than might have been exacted had a meter been used, the remark about benefit being dictum.

Under Section 749 of the Code, the trustees of the waterworks are to fix rates for the service rendered, not for the benefits received. Taking all these matters other than benefits into ·consideration, it cannot be said from the record before us that the rates fixed were discriminatory or extortionate. Though the trustees erred in taking into account the benefits that the owners would derive from the sprinkler systems, it does not appear but they did the same in adjusting other rates, nor was it shown what was added because of · such benefits. If any material amount was added to the rates because of these, undoubtedly the trustees will readily adjust the same. The charges exacted in other cities, even though of like population, furnish little aid, for conditions may be

and usually are different, especially where, as in this state, the revenues necessary for city-owned . plants may vary as the needs of the sinking fund interest charges and for extensions change. From what has been said, it is evident that the matter of fixing of rates involves many considerations, and is somewhat complicated by the relative bearing that each of these has in determining the fair and just compensation which should be exacted. We can only say that, from the evidence adduced, it does not appear that the compensation exacted for service rendered sprinkler systems was discriminatory as compared with other rates exacted, nor that the charges were extortionate. The motion to strike from appellees' additional argument is sustained, they having no right to file same.

It follows that the decrees entered must be and are— *Affirmed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.