Wisconsin Telephone Company, Appellant, vs. Public Service Commission, Respondent.

*March 11—July 11, 1939.*

For the appellant there were briefs by *Miller, Mack & Fairchild,* and oral argument by *Edwin S. Mack, Frederic Sammond,* and *T. C. Bolliger,* all of Milwaukee.

For the respondent there was a brief by the *Attorney General,* and *James Ward Rector,* deputy attorney general, and

*Harold M. Wilkie,* special counsel, and *Daryal A. Myse,* counsel for the public service commission, and oral argument by the *Attorney General, Mr. Wilkie,* and *Mr. Myse.*

ROSENBERRY, C. J.  The nature of the issues in this case is best disclosed by a statement made by the commission in the opening paragraphs of its order issued under the date of April 30, 1935:

"This investigation was instituted on February 10, 1933, on the commission's own motion, for the purpose of certifying reasonable annual rates of depreciation to Wisconsin Telephone Company.  This action is pursuant to section 196.09 of the Wisconsin statutes, which, in so far as this certification and order are concerned, provides as follows:

"(1) Every public utility shall file with the commission, within such time as may be required by the commission, its estimate of the average annual rate of depreciation required for each of its classes of fixed capital used for public utility purposes, and of the composite annual rate of depreciation required for such fixed capital as an aggregate, which shall constitute the public utility's estimates of the amount which should be returned to it out of its rates for service, to meet the depreciation of its property.

"(2) After the submission of such estimates, the commission shall review the same.  If it shall determine that the estimates submitted are reasonable and proper, it shall certify that determination to the public utility.  If it shall determine that the estimates submitted are not reasonable and proper, it shall certify to the public utility the percentages which it considers reasonable and proper.  In case the fixed capital accounts of the public utility are not so subdivided as to permit the rates for the various classes of fixed capital used for public utility purposes to be applied, the estimates submitted by the public utility and the percentages determined by the commission may be based upon the aggregate of such fixed capital.

"(3) After the commission shall have certified to the public utility its findings as to the percentages required for depreciation, such public utility shall have thirty days within which to make application to the commission for a hearing and

order. If the public utility does not make application to the commission for a hearing and order within the time set, the commission's certification of findings shall have the effect of an order and the public utility shall have the right of appeal therefrom as provided in this chapter.

"(4) The commission may provide, in order to meet changing conditions, that public utilities shall submit the estimates herein referred to from time to time, and in case it requires such resubmission of estimates, it 'shall follow the procedure with reference to certifying its findings as provided above. In revising the reasonable and proper percentages of depreciation the commission shall give consideration to the experience of the public utility in accumulating a depreciation reserve under previous rates, the retirements actually made, and such other factors as may be relevant.

"(5) When the commission shall have established, by certification or order, the reasonable and proper percentages of depreciation, such percentages shall constitute the percentages to be used in any proceeding involving the rates or practices of such public utility, provided that if at the time of such proceeding it is found that the percentages of depreciation previously established are no longer reasonable and proper the commission shall establish reasonable and proper percentages for the purpose of such proceeding and certify such new percentages in the manner provided by this section.

"(6) When the commission shall have established for any public utility, by certification or order, the percentages necessary for depreciation on fixed capital used for public utility purposes, such public utility shall credit to its depreciation reserve in each accounting period such amount as may be required to provide for depreciation at the percentage or percentages established. . . .

"As provided by law, the commission's order of February 10, 1933, requires Wisconsin Telephone Company to file depreciation estimates with the commission on or before March 10, 1933. Such estimates were duly filed by the company with Vice-President Hobbins' letter of March 9, 1933. At the time these estimates were submitted, the commission and its staff were engaged in investigations directly connected with the state-wide rate inquiry of Wisconsin Telephone Company. In consideration of the importance of the

rate action to the people of Wisconsin, the commission deemed it inadvisable to divert its efforts at that time to a detailed study of the company's depreciation rates for accounting purposes. Accordingly, the company's estimates of depreciation and the depreciation analyses of the commission's staff were originally submitted in the general rate case, Docket 2–U–35, rather than in this proceeding. The record made in 2–U–35 provided a basis for the commission's depreciation findings in three temporary rate reduction orders which have been issued in the state-wide investigation, but no certification of depreciation rates for accounting purposes has been issued in this docket prior to this date.

"In June, 1934, the interstate commerce commission acting under the terms of paragraph 8 of its order of July 28, 1931, in No. 14700, *Depreciation Charges of Telephone Companies,* issued depreciation section series Circular No. 9, directing all Class A telephone companies, including Wisconsin Telephone Company, to file with state commissions certain schedules showing estimated depreciation percentages and the basis of such estimates. State commissions were requested to examine the estimates and supporting data and submit recommendations of reasonable depreciation rates to the interstate commerce commission. In cases where informal agreement could not be obtained with utilities involved, state commissions were advised to make formal records upon which to premise their recommendations. Under the interstate commerce commission's program, state commission recommendations were to be submitted not later than November 1, 1934.

"Subsequently the Communications Act of 1934 became effective and the federal communications commission, by section 220 (b) thereof, was granted certain powers over depreciation rates of carriers and classes of property subject to that act. The federal communications commission, telephone division, in Order No. 10A, issued December 13, 1934, extended to May 1, 1935, the time for filing state commission recommendations.

"To avoid duplication of investigational work, and unnecessary formal hearings and records, the task of making recommendations to the federal communications commission was combined with the proceedings in this docket. To ac-

complish this purpose a supplementary notice of investigation and order for assessment of costs was issued in this matter on July 20, 1934. About the same time, the company was requested to submit additional schedules showing a breakdown of depreciation estimates between exchange and toll property and certain historical data.

"These schedules and those requested by the federal commission were duly filed by the company and examined by the commission's staff. Studies were also made to bring up to date the staff's 1932 depreciation study originally introduced in 2–U–35. This investigation disclosed no serious errors in the company's basic retirement data or in its method of mathematical analyses as used in turnover or mortality studies. The staff disagreed, however, with the company's methods of determining service life for buildings and central-office equipment and with the interpretation given historical data in making the service life and salvage estimates included in the company's study.

"A conference was held on February 25, 1935, with the company representatives to adjust these differences in principle, but no understanding was reached concerning the chief points of controversy. The company's representatives took the position that the methods used by them were required by the interstate commerce commission's depreciation orders in No. 14700 and the uniform classification of accounts for telephone companies and that the consideration given historical data in their estimates was proper and reasonable under the circumstances. The company indicated unwillingness to accept any revisions of its proposed depreciation percentages, although several of the underlying estimates were based largely on judgment.

"In view of the disagreement between the company and commission over important underlying principles of depreciation, no informal certificate of reasonable depreciation rates was issued in this matter. To develop a record as a basis for a formal certification and order in this matter, hearings were scheduled and held in Madison on April 1, 9, and 10, 1935, at which Commissioners McDonald and Hunt presided. . . .

"Chief Engineer Crowell testified for the company in support of the depreciation estimates submitted in response to

the interstate commerce commission's orders referred to above and the various requests of this commission. Schedules submitted on request of the federal commission are included in Exhibit No. 1 in this proceeding. Those requested by this commission are identified as Exhibit No. 2. Historical data in support of the company's estimates are also included in Exhibit No. 1. These same data provide the basis for some of the schedules shown in commission Exhibit No. 5. Mr. Crowell also introduced Exhibits Nos. 3 and 4 which present, respectively, a statement of the company's position with regard to major controversial issues and a comparison of unit and group depreciation rates on selected buildings and manual central-office installations.

"Mr. A. R. Colbert, acting chief of the commission's accounts and finance department, and Mr. Cyrus G. Hill, commission special utility engineer, presented the views of the commission's staff and offered testimony in support of Exhibit No. 5 which contains the commission's recommended depreciation rates and explanatory information. By stipulation of counsel, Crowell's testimony in Docket 2–U–35 which explains the company's depreciation methods and practices, together with company Exhibit C–184, and commission Exhibits C–24 and C–25 in the same proceeding, were made a part of this record in so far as such may be pertinent to an order by the commission. The transcript in this docket, excluding the portion stipulated from 2–U–35, comprises three hundred eighty-four pages and covers in considerable detail the various problems involved in depreciation accounting and depreciation estimates. During the past three and one-half years, Mr. Colbert has studied in detail the company's depreciation methods and practices and testified on this subject in 2–U–35. Mr. Hill, for nearly the same period of time, has been engaged in an intensive investigation and detailed appraisal of the company's property."

Following the issuance of the order, and on May 18, 1935, the company submitted a detailed nineteen-page application for rehearing, alleging certain errors of fact and law in the commission's order of April 30th. Rehearing was granted, and a rehearing was had on December 5, 1935. In the opinion and order dated December 20, 1935, the commission fully

reviewed the matters presented to it on behalf of the company and affirmed the order of April 30, 1935, except that it modified the same by making the effective date of the certification January 1, 1936. In the brief of the company, the following statement is made:

"The appellant is not asking this court nor did it ask the court below to determine the reasonableness or correctness of the *individual* depreciation rates prescribed in said certification and order for its several plant accounts. Much less does it ask the court to determine the correctness of the service lives and salvage estimates underlying the determination of each *individual* depreciation rate. It does not consider these things to be an issue for an appellate court.

"The one issue of the reasonableness of the said certification and order relates to the over-all results of the said order and the methods used in its formulation. It is appellant's contention that the reasonableness of said certification and order as a whole is properly an issue for determination by this court and was for the court below. The appellant asserts that the circumstances of the issuance of the said certification and order were such as to destroy, as a matter of law, all presumptions and burdens of proof which would otherwise attach, but that if such presumptions and burdens were applied the evidence still is clear and satisfactory that the order was unreasonable under the circumstances of its issuance since it was largely written and submitted to the commission *ex parte* by the principal witness and investigator for the commission who had prepared each and every determination in advance of the hearing."

The company further contends that the commission was not warranted in rejecting the composite proposed rates, and finally, that the order is unreasonable and unlawful because based on arbitrary, inconsistent, and unfair determinations, and in violation of prescribed principles.

The question of what constitutes a proper depreciation charge when applied to the property of a public utility is one of the most controversial and elusive with which courts are called upon to deal. Engineers and accountants disagree

violently not only upon principles to be applied but upon the method of their application. In this case, the depreciation rates prescribed by the commission applied to the book value of the depreciable property as at the end of 1934 composite to 3.56% as compared to a composite of 4.53% proposed by the company. The difference between the rates ordered by the commission and those proposed by the company approximate $700,000 in annual depreciation expense for the entire property. It is not to be denied that the amount of the depreciation charge is a matter of vital importance to the company. The supreme court of the United States has said that if the company fails to make a sufficient depreciation charge and by reason of that fact is ultimately deprived of some of its property, it is its own fault. On the other hand, if the depreciation charge is too high, subscribers are compelled to make capital contributions to the company.

The law is stated in *Board of Public Utility Commissioners v. New York Tel. Co.* 271 U. S. 23, 31, 46 Sup. Ct. 363, 70 L. Ed. 808:

"Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. *San Joaquin Co. v. Stanislaus County,* 233 U. S. 454, 459; *Gas Light Co. v. Cedar Rapids,* 144 Iowa, 426, 434, affirmed 223 U. S. 655; *Consolidated Gas Co. v. New York,* 157 Fed. 849, 858, affirmed 212 U. S. 19; *Ames v. Union Pacific Railway Co.* 64 Fed. 165, 176. The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. Cf. *Fall River Gas Works v. Gas & Electric Light Com'rs,* 214 Mass. 529, 538. The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a

reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. *Galveston Electric Co. v. Galveston,* 258 U. S. 388, 395; *Georgia Ry. v. R. R. Comm.* 262 U. S. 625, 632. And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. *Newton v. Consolidated Gas Co.* 258 U. S. 165, 175; *Galveston Electric Co. v. Galveston, supra,* 396; *Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Comm.* 292 Fed. 139, 147; *City of Minneapolis v. Rand,* 285 Fed. 818, 823; *Georgia Ry. & Power Co. v. Railroad Comm.* 278 Fed. 242, 247, affirmed 262 U. S. 625; *Chicago Rys. Co. v. Illinois Commerce Comm.* 277 Fed. 970, 980; *Garden City v. Telephone Co.* 263 Fed. 693, 696.

"Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company, just as does that purchased out of proceeds of its bonds and stock. It is conceded that the exchange rates complained of are not sufficient to yield a just return after paying taxes and operating expenses, including a proper allowance for current depreciation. The property or money of the company represented by the credit balance in the reserve for depreciation cannot be used to make up the deficiency."

On December 31, 1934, according to the finding of the commission, the fixed capital of the company in service was $78,095,139. On that day there was in the depreciation-reserve account $23,470,410, the ratio of reserve to fixed capital being 30.1%. By virtue of sec. 196.09 (8), Stats., a public utility is forbidden to charge to its depreciation reserve anything except losses on property actually retired from service. The company claims and the trial court found that

the present plant of the company was approximately 90% efficient, in other words, that the accrued depreciation was 10%. If the total depreciation reserve account is 30% and the accrued depreciation is 10%, the company must be holding 20% against future contingencies. It is not necessary for us to repeat here what was said in the companion case, *ante*, p. 274, 287 N. W. 122, 287 N. W. 593, in regard to depreciation where we had under consideration the rate base. While it is true that the company may not recoup its loss if the depreciation rate is too small, it is equally true that the public has no redress for contribution to capital arising out of excessive depreciation charges. *Board of Public Utility Commissioners v. New York Tel. Co., supra.* It is apparent from the fact that the company has maintained its plant over the years in a condition 90% efficient, and has accumulated a large depreciation reserve that a reduction in the annual depreciation allowance must be made if the ratepayers are not to continue to make capital contributions to the company. What the amount of the depreciation charge should be is largely a prediction. We have given this matter careful consideration, and it is considered that this court cannot say upon the record that the depreciation rates established by the commission are unreasonably low. While it is quite apparent that they are not generous, and probably leave a very small margin, they cannot be set aside for that reason. It appears to us that this matter of the amount of depreciation charge is one peculiarly within the province of the commission and not to be disturbed by the court except in a clear case. The effect of the depreciation charge must be considered in connection with the maintenance account. It is not the function of the commission either in establishing the depreciation charge or fixing a rate to pare the charge or the rate down to the lowest possible figure. That, as we have already pointed out, does not meet the test of reasonableness. However, in this case we are not dealing directly with rev-

enue but with only one factor which affects net revenues. In its order the commission said:

"Taking all factors into consideration, the commission finds and determines that the depreciation rates which are herein certified and ordered are reasonable and proper for the purposes of this certification and order, provided, however, that, in accordance with section 196.09, nothing in this certification and order shall bar the commission or the company, after approval by the commission, from making such revisions in such rates as may appear reasonable and necessary from time to time."

In the opinion in the companion case we have dealt with procedural matters, and it is not necessary to repeat here what was said there. The opinion and order on rehearing discloses that all of the contentions of the company were fully and carefully considered. While, as the trial court said, the proceeding is somewhat anomalous, we discover no ground for saying that it is not in accordance with the provisions of the statute. Sec. 196.09 (3), Stats., provides:

"After the commission shall have certified to the public utility its findings as to the percentage required for depreciation, such public utility shall have thirty days within which to make application to the commission for a hearing and order. . . ."

It is apparent that the depreciation procedure differs materially from that relating to rates, charges, and tolls.

*By the Court.*—Judgment affirmed.